on behalf of the athlete. Mr. Joe. Mr. D. Domenico. I think I want to start by discussing the procedural slash jurisdictional issue that was raised in the blue brief and that was subject to some additional discussion by way of a motion to cite additional authority. The claim made in the blue brief is that the use of section 212.03 as a challenge to the entry of the judgment that was entered in May of 2012 was improper because the judgment wasn't final. I've given you a lot of different theories on that issue and I think that the answer boils down to this. The judgment is considered bifurcated because it did not resolve the issue of personal property. I think we can all agree on that. I don't think that the addition of 304A language to that judgment would have rendered it appealable to this court. So it wasn't final and appealable and therefore not attaching 304A language would, if it did not confer appealability on this court, that order wouldn't be considered final either. So what's the only other thing that judgment could be considered? Interlocutory. It's either final, final and appealable, or it's interlocutory in nature. And trial courts cited the case, some case law in the motion cited additional authority, of course you have the inherent authority to entertain actions to modify, vacate, change or otherwise modify an interlocutory order at any time prior to the entry of the final judgment. And the disposition of such actions falls squarely within the scope of review once the judgment becomes final. Now I think the rub here is because it's odd to think of a judgment for dissolution of marriage that divorces you and that disposes of almost every issue in the case, distributes your property, deals with maintenance, child support, attorney's fees, it's odd to think of that as an interlocutory order. But that's in fact what it would be. And I think that the cases don't really describe it in that way because all of the case law on this topic has to do with why it doesn't belong in the, why the cases don't belong in the appellate court, because they're not final and they're not appealable. They don't, they're not concerned with describing the judgments in a way, in what way as to what the vehicle for relief to obtain in the circuit court is. And I think that's what the debate here is. Since it's purely interlocutory order, since it's not final or appealable, the only other thing it could be is interlocutory. So since the court has inherent authority to move to modify interlocutory orders at any time, the argument that 1203 was the wrong vehicle here is simply a formal or substance point. Because there's certainly lots of cases that talk about that this, you know, the title of the motion does not control as the substance. And since the court can entertain an action to vacate an interlocutory order, we feel that the order denying, the order denying that request for relief is swirly before your honors as far as being able to review on the merits. We talk here in the second district and have asked the Supreme Court to help us with that about claims. Claims pending. There was still a, this is a total divorce. This isn't post judgment, this is a divorce, correct? That's correct. And within that divorce, there are different issues or what we might call claims. A claim for maintenance, a claim for property distribution, a claim for insurance, a claim for all sorts of things. All the claims were not resolved at the time that this motion was resolved, correct? There was still property. That's correct. The personal property motion was filed and is still pending. That's correct. But again, I think that the way, if it's not appealable, it's not final, it has to be interlocutory. There's no other characterization of an order left. It can either be final, appealable or interlocutory. It's purely interlocutory, as odd as it sounds, to describe a judgment that did all the things that this judgment did except dispose of personal property. As odd as it seems to call that interlocutory, that's what it is because that's the only thing left to call it under the law. Would it make a difference if the item reserved was, how do I explain this, was a minor issue with result, with a minor claim? Or doesn't it make any difference? I mean, could they be fighting over pots and pans or could they be fighting over Rembrandts? Would it not make a difference? I don't think under the law it makes a difference. And when I get to the merits of the personal property distribution, one of the things I'll say is, you know, the statute doesn't make a difference between, if we're talking about Rembrandts or pots and pans. Marital property is marital property. And if it's part of that claim, it's part of that claim. You don't have a right to say, I mean, the 1203 motion was, the references to 1203 were made in my brief as well as they were in the actual motion filed by my predecessor counsel. But again, it's a form over substance because the substance of the motion was to vacate an interlocutory order, which the Court certainly had the inherent authority to do. And there's certainly no obligation to re-up that claim once the judgment became final, which is the suggestion in the blue brief that she was somehow required, we were somehow required to re-file that same motion. Of course, there's no obligation in a non-jury trial to file a post-trial motion at all. So on the merits, to talk about the motion to vacate first, what you have here is a multi-layered claim dealing with part of undue influence on part of my client's experience as a lawyer at the time, part of a hastily contrived agreement in that she only received the final document the day before, and that she was under a significant amount of duress and was experiencing an incredible amount of stressors at the time that this document was executed. Even accepting all of those things, just for purposes of this question, your client's primary issue, as I've read the record in some of the transcript, is she did not want a divorce. It would not have made a difference what she was getting or what she wasn't getting. She didn't want a divorce. Is that accurate? I don't think that's accurate. It's belied. I think that's the claim made in the blue brief, and I think that it's belied by the fact that she filed for divorce. Harvey Frazier filed for divorce. Carol Frazier filed for divorce. It's not that she didn't want to get divorced. It's that she wanted a fair deal. More specifically, she wanted a trial is what she wanted, and that's what she told her lawyers, that she wanted the case to go to trial. She felt that the marital settlement agreements that were given to her the night before the judgment was ultimately entered were substantially written by her husband's lawyers, and the email that was proffered at the hearing on the motion to vacate made it clear that she was telling her lawyers, it looks like we're going to trial. I find this agreement unfair. I don't even think I can live up to it, because how am I going to pay for this mortgage all by myself? How am I going to manage this $1.6 million house all by myself with no maintenance, with an obligation to pay her own attorney's fees, which were substantial at the time? I can't do it. All she wanted was her trial. So I don't think it's fair. Even if, and I think her attorney somewhere said, or it's alleged, and one of the problems with this is I'm reading four other ones in my office, and this is the one up today. But there was some discussion about go to trial, you're not necessarily going to get what you want either, correct? That was the testimony from the lawyer that he had advised her, you're not going to do any better at trial. In fact, you could do worse at trial. Now, I find that statement particularly curious, because if you've read the maintenance provisions of this agreement, there are so many conditions on this maintenance. It has to be at least, Mr. Frazier is entitled to earn $60,000 from employment. There's various exclusions about passive income, non-marital income that are not, that my client effectively has no claim to maintenance for, that are only for five years with a termination date. As we all know, a court could never order any of those things. A court could, after a trial, a court could never put so many conditions upon maintenance that it would effectively preclude her from ever getting maintenance, let alone set a termination date. The Supreme Court has said that. Would Mr. Frazier have to pay maintenance out of non-marital assets?  Or non-marital income. And the Heroi case that we cited in the brief makes clear that maintenance can be ordered from non-marital income. Certainly the claim for non-marital property is different than the income. But to me, that's why the claim that, well, you should just sign this document because you're going to do worse at trial or you're not going to do it, that's, it doesn't square with what Judge Brodsky could have ordered after a trial on maintenance, which is a substantial part of this. Because with no alimony and no right to any sort of additional income going forward, she's on her own with this house to figure out how to refinance it and pay her own attorney's fees. And a judge could never have ordered the things that were included in this agreement. I mean, my goodness. Was sale of that property precluded by the agreement? It doesn't reference a sale specifically. It says 30 months to pay off the  mortgage or, you know, use that money that she was awarded in the agreement to retire the mortgage, which only, of course, reduces her income-producing assets. So, again, the claim, the idea that she, that the lawyer is telling her she would have done worse, that's just not accurate. There was things ordered in this agreement. I mean, how about the part regarding Well, she could have been denied maintenance. How inconceivable as it may be to you and your clients, she could have been denied maintenance, so all of those conditions wouldn't be an issue. It just could have been denied. She could have been denied. I would suggest that that was, that is the unlikeliest of outcomes on these facts. In a 25-year marriage where my client was a homemaker and financially dependent upon Mr. Frazier her entire life and raised two children and was out of the workforce for a long time, I find, certainly possible. I think that if I were here on the merits of that, I'd have a pretty good chance of getting it reversed. But, you know, there wasn't the only part of the agreement that a judge would never order. I don't think a judge would have ever ordered her to be solely responsible for the mortgage. And how about the acceleration clause? If she misses one payment, one payment, she has to pay off the whole mortgage. No judge could ever order that. You need to read some records, counsel. Excuse me? You need to read some records that we read. Very good. With respect to how the judge handled his decision at the end, you know, I looked at some cases and made clear that, you know, on prior Can we back up a second on that? Yes. The merits of your claim that this was basically an unconscionable agreement. You indicated there were three factors, undue influence, duress, and that it was a hasty agreement. I don't really think the record bears that out. I mean, there were months and months of back and forth. Granted, it was never all put in one document because we know lawyers can't put it all down on the table. There's a gun to their head. But certainly the substance of these various clauses and parts of this agreement had been discussed with your client many, many, many weeks prior to the day the agreement was actually signed. Coincidentally, the day of trial. So this was one of those agreements where it was signed in the hallway or we're going to trial in an hour. That's correct. But my point is, I read the record to show that really there was much ongoing discussion back and forth about these various clauses. Well, there was. I mean, none of the prior drafts of any agreements entered into the record at the hearing on the motion to make it. There were discussions that there was sort of an ongoing work in progress. Yes. I certainly can't dispute that. And that really none of what was in the final product was sprung on her, so to speak, that everything that wound up in the final product had been discussed substantially before the day the agreement was entered. And in addition, excuse me, the attorney indicated that the agreement itself was read to her three times before she signed it and discussed with her at length that day also. And to add to what Justice Jorgensen mentioned, I think the record also shows that there were a number of pretrial conferences during the course of these settlement negotiations as well. That's correct. I mean, certainly the settlement discussions had been ongoing. I don't think there's any dispute about that. But, you know, the issue with the House, you know, was the most important, certainly the most significant to my client. And I think that she testified that up until the night before when she was in court on May 23rd, given the agreement to take home, she had only, you know, one opportunity to read it. She had the issue with her son being up late at night running around trying to get his physics homework done and he was going to fail his class. She was still emailing her lawyers at that time, look, I don't agree with this. I think we're going to trial. Please present the motion in limine. I'd like to get a ruling on that. That's what her testimony was. So whether or not it was ultimately something that was, whether or not it was something that was negotiated or debated or thought about over time, it doesn't change the undisputed evidence that up until the time that it was actually signed and the day that it was actually signed, she was voicing objections to her attorney that she didn't feel it was fair and she didn't feel she could live up to it. And in that way, I want to talk for a second about, you know, the way that Judge Brodsky handled the disposition of the motion. I mean, effectively had a judge who re-read the proof of testimony back into the record and said, this is what you said. I'm not going behind it. And I think that the case law that we cited in the motion is a little bit more, the analysis is a little bit more sophisticated than that. I mean, you have to look at the circumstances, the extenuating circumstances that led her to say the things that she said. It's not simply a matter of saying, well, this is what you said, and you're stuck with the judgment. If that were true, no one could ever succeed in vacating a judgment on a theory of duress or coercion or undue influence or any of the things that are alleged in this case. And I might point out, Judge Brodsky, you know, on January 15th, the record shows that my client filed an emergency motion to continue the hearing on the motion to vacate, which was set for the next day. And the allegation was, and there was doctor's notes attached to it, that she was in Sarasota, Florida, in a hospital with her dying mother. Judge Brodsky denied the motion and said, you know what, you can testify by phone if you wish. Now, to me, that is indicative of how he ended up handling this. What use is my client's testimony while she's standing in a hospital on her cell phone next to her mother who's dying of stage 4 liver cancer? Is that testimony going to be, you know, is it reasonable to put somebody in a position to have to testify under those sort of emotional circumstances? And that, I think, is indicative of how he only considered what he's being told and the words on the page of the proof-of-transcript when he ruled on the motion to vacate at the end. He wasn't concerned about what other circumstances might be going on in her life. And, of course, the next day, unfortunately, Carol's mother passed away, and the second motion was brought in. He did get a continuance because her mother died. But I think that that's indicative of how he ended up handling the motion itself, and I think that that's contrary to the case letter we cite in the brief. Counsel, your time is up at this point. You will have an opportunity for a response if you'd like. Thank you. Thank you. All right. Good morning, Mr. Oster. Good morning, Your Honors. Mr. DiDomenico, I just want to briefly address the two-to-a-month fee issue. And, essentially, what the position that Mr. DiDomenico is taking would result in chaos. It's probably too strong a word, but every judgment in which something was reserved or many things were decided were going to decide something later, having motions for reconsideration when that's not the way that the legislature and the Supreme Court has designed the process to be. The case law is consistent that the issues raised in a 212.03 motion are not preserved unless the motion is raised after the judgment is final and is disposed of after the judgment is final. Lye and Stonebridge both say that. And the problem here is that what the 212.03 motion purported to be was to say this whole process was unconscionable. It was unconscionable in the way that the judgment was honored. The judgment itself was unconscionable. The only way, and that issue is not preserved by a 212.03 motion that's brought before the judgment is final. And Lye says you have to bring it again afterwards to preserve the issue. And Stonebridge indicates that, and that was not done here. Well, why would you do it again if you've already done it once? Because if you – the precedent was set if this motion to reconsider was considered under 212.03, let's say that the personal property issue unwound differently than it did in this case, that Carol Frazier cooperated, that they both presented their lists, and the judge ended up making a personal property decision that Harvey Frazier thought was outrageous. Then he'd be entitled to bring his 212.03 motion after the judgment was final, and you have multiple 212.03 motions by the party. And that's not the process as it was designed to take place. The process as it was designed to take place was after the judgment is completely final, then each party has 30 days in which to try and convince the judge that something that he did was unfair or erroneous, and after that's disposed of, you go to appeal and those issues are preserved. So the case law as it exists is consistent in that regard, and to change the case law would encourage multiple 212.03 motions or motions to reconsider repeatedly as cases move along. And, you know, part of the whole picture of this case is judicial resources, especially in the domestic relations department, I would say, are pretty scarce and precious. And in the particular matter of civil motions to reconsider, I think it addresses all divisions of the court, which is that we're only going to do this once. And the one time to do it is after the judgment is completely final. Well, you talked about judicial resources, and that's a valid point, but the real issue of a 212.03 or any motion of that nature is to preserve the issues for later. And why can't they be preserved closer in time to the incident so everyone has a fresh memory as opposed to months, maybe even years down the line because of those judicial resources? Well, I don't think it's any different from an appeal that sometimes isn't heard for a year or two after the case. I know. By that time, your issues should be, let's put it that way, unless you've got a void issue. Your issues should be preserved. Your issues should be focused on. Why can't you focus on the issues early when everybody still has them fresh? Because everybody gets it. I mean, people get transcripts anyway. It's not like Judge Brodsky seven or eight months later. And I can't remember the exact time frame, but he did hear the motion to vacate. It didn't take place with Carol Frazier on the phone. Everybody got to present their evidence. But he very well recalled what had taken place to prove up on what the history of the case was. Excuse me. And not all cases, in fact probably not too many, have a large gap in time between most of the case being decided and one or two issues being decided later on. I don't think that it's prejudicing anyone to have to wait until the whole thing is final to file two 1203 motions. And in the Lye case in particular, the motion to reconsider had been heard in fairly close proximity to the judgment, but there was a pending contribution hearing, which took place some time later. And then Mr. Lye brought a motion to reconsider again. The judge said, I've already heard this. This is very pseudoconic. Goodbye. And the appellate court said the first one didn't count. Now go hear the motion to reconsider. At that point it would have been two or three years later. So. Well, it's what the appellate court primarily said is raised here. It kind of does not apply because it was not a final, it wasn't a final judgment. And Mr. Ostrow, that was obviously you were part of that case. You remember it rather. Which is why I felt that it was necessary for me to raise the issue. Rather candidly, I'm sure. But the real issue there was Judge Snow said, no, this has already been decided. I'm not going to deal with it. And the appellate court said, no, you don't have a final judgment until it is final. And so raised pseudoconic can't apply. But I don't know. Well, we don't know what happened when it went back because I didn't see a subsequent lie case, lie two, unless there is one out there. I think there actually is one, but I'm not sure it dealt with that issue. But the fact remains, they were worried about raised pseudoconic because she raised that flag. Pretty high in her decision. Right. But they're also saying that the disposition of the 2-1203 motion at the time it was originally brought was premature and did not give them an issue to adjudicate whether she should have denied or granted the 2-1203 motion in the first place. Because it wasn't, well. Yeah, it wasn't a final judgment. And because nobody asked them to at the time either. I mean, there wasn't a 304A finding affixed, was there? There was not one. Whether somebody asked for one or not, I don't recall at this point. I don't think there was. There was not one. Okay. But I also do want to say that, as I referenced, because I was involved in the lie and because of other cases that have come down since, I felt I had a responsibility on my client to raise this issue. But I don't want to infer at all that, or that to infer at all that we're troubled by the underlying substance of issues in the case because we are not. And under questioning from the panel, Mr. DiDomenico said, well, it was Mr. Marcin's testimony anyway that he told Phil that she could do worse if the case went to trial. But it wasn't just Carl Marcin. It was Judge Brodsky. Judge Brodsky, at the motion to vacate, said expressly that he had told the counsel and the parties during the pretrials and the three days that they were negotiating in court at the end that his recommendation was worse than Carl ended up being able to settle for. In fact, at the motion to vacate, he said, I forget the exact word he used, but he said you cleverly managed to get $240,000 more than I would have given you and a reservation of maintenance that I would not have given you. And there is no evidence in this record that the lack of paying maintenance is some sort of unconscionable result. In fact, Mr. Fraser had not worked since 2005, and in the record it says that the parties' expenses had been paid in the intervening period by investing the assets. Well, now Carol Fraser has more than half those assets, so there is no per se unconscionability in the reservation of maintenance. In fact, Judge Brodsky thought that Carol Fraser had done well to orchestrate that reservation. The house is a big nut in this particular, at least on paper it is, 1 point something million, and it probably has a decent sized mortgage. Was there any prohibition in the agreement against selling the house? No, there wasn't. And not only that, it is a $1,600,000 house, and the record is that the children are all emancipated. Well, they weren't quite. There would be in the 30-month period in which Ms. Fraser had refinanced, which, by the way, the record showed that the attorneys for Mr. Fraser had neglected to have a refinancing provision in there, which almost every lawyer whose client is not good in the house would insist upon, to get you off of the debt. And so she actually insisted that she have that refinancing requirement, and 30 months is a much longer period of time than most people would have to do that at any rate. But she's not, Carol Fraser's not stuck with that house. She, if it's an expense that she feels she can't afford under the division of property and getting a total of $4.2 million in assets, then she can alienate the house and get the equity out of it. But also, as I think Justice Jorgensen said, and then Mr. Dudenberger said, well, there weren't drafts at the motion to vacate of the marital settlement agreement, but the motion to vacate was brought by Carol. So if any preceding drafts would have had any relevancy to them, they should have been adduced by her at the hearing. But what there wasn't at the hearing was her attorney's letter of May 17th, which she, which her attorney said she authorized. And Mr. Marcian's credibility was judged by Judge Brodsky, and that credibility assessment is generally not overturned by higher courts, and Judge Brodsky saw this unfold anyway. But in that letter of May 17th, he asked that Carol Fraser be given 53% of the assets. The settlement was for 52%. Carol Fraser asked for the five-year reservation of maintenance predicated solely on if Harvey once again had earned income. She got that. She asked for a 50-50 split of medical, I believe it was. She got that. She asked for a 60-40 split of college, and the college ended up settling for 50-50. So those, and she wanted a house with the refinancing provision. So those are all the main provisions of this agreement. They were all in a letter written by her attorney to Mr. Fraser's attorney on May 17th. The record shows that Carol Fraser spent days in her attorney's office preparing for trial. Carl Marcian testified that he told her he wouldn't go to trial. He advised her against it, given what Judge Brodsky had recommended, and that's his job. And it's also Judge Brodsky's job. You know, the statute says that we are to promote the amicable resolution of these dissolution of marriage cases. And in that, in furtherance of that policy, Judge Brodsky conducted many pre-trials, had set aside three days for trial, but a lot of the parties seemed to negotiate, finish the negotiations of the settlement agreement that had started long before that. And they spent basically every hour of three days getting this accomplished. And it was accomplished in virtually the terms that Carol Fraser had asked for. The other things that I would say, you know, as Mr. DiDomenico advocated in his brief, unconscionability can be either in the process or in the consequences. And it's not, there's no case that he has cited that's anywhere similar to what took place here. In all the cases in which the vacation of the judgment was sustained by an appellate court, the party complaining had no participation in the process, didn't understand the terms of the judgment, the negotiations weren't at arm's length. That's not what happened here. I don't want to beat this to death, but there were numerous pre-trials, and there were, you know, lengthy negotiations. And she spent a great deal of time with her attorneys, which she testified to that she had spent a great deal of time with her in the day and prepared her. How many different attorneys represented Mrs. Fraser and how many represented Mr. Fraser at the trial court? I think Mr. Fraser only had one. I could be wrong with that. I think he had Katz, Goldstein, and Warren through the entire proceeding. Mrs. Fraser had four or five prior to the divorce and then five or six afterwards. And I realize my time is up, too, but I do want to say that at the proof of Mrs. Fraser said she had no objections to the way the money was being divided. Her objection was to getting divorced. It was theological. It was not economic. And then later when she brought a motion to vacate, it became economic, as Judge Brodsky pointed out. And as Mr. DiDomenico said, she herself had filed for dissolution. And she stands at a proof of and says, I don't believe in divorce. And even a couple months before the proof of, she tried to change the grounds to adultery. And so I think that Mrs. Fraser has a tendency to change her mind, but that tendency or saying I want to trial isn't dispositive of this case. What is dispositive of this case was did she participate in settlement negotiations that she understood and wound up in a not unconscionable resolution of this case. And that is what occurred here. Counsel, could you take a couple minutes and talk about the property settlement, the personal property settlement? Yes. The court had or the mayoral settlement agreement had said we have 30 days to agree. If we don't, the court will set some process or divide the property. They weren't able to agree. Ultimately, Harvey Fraser brought a motion to have the court dispose of it. That motion got continued many times, which was the source of Judge Brodsky's frustration later in January. But he didn't follow through in the way that he said when he denied the complaints. But at any rate, it wound up in front of another judge, which I believe was in February of 2012. And that judge said, and it was set for hearing that day, and Mrs. Fraser suddenly was trying to change her attorneys, but both attorneys were in the case at that point. One of the attorneys said, well, Mrs. Fraser was here, but she's left the courtroom. I don't know where she is. The judge said, well, it's set for hearing today. Here's what I'm going to do. I want both parties to submit me a list of marital property that they want, non-marital property that they claim is theirs, and then I'll decide on those lists in April. And in April, Harvey Fraser prepared his list. Carol Fraser did not. And then on the day in April, she said, well, her attorney said, well, she didn't prepare the list, but she has a list of what she objects to. The whole process that Judge Johnson selected was to avoid somebody from going out on his golf clubs. You know, it was to, I mean, this had been a contentious case, and so he. The bottom line here is how, can you justify how the court complied with the statute in the property settlement that it rendered? In the personal property settlement? Yeah, I'm sorry, I keep saying personal property. Yes, it, well, it complied with the marital settlement as well, so the court would set a process. But the court gave Mrs. Fraser an opportunity to make, to say what marital property she wanted, and if those claims overlap with Mr. Fraser's, the court would have made an adjudication accordingly. And if she had non-marital property claims, she had an opportunity to submit them, and the court would have, to the extent that she could verify them, afforded her her non-marital property. She did that, didn't she, by commenting on his list, but yet the judge wouldn't take a look at what her attorney at that point submitted to him and just decided that he was going to give your client everything he had asked for. Well, what he decided was that there was a process that I ordered. Mrs. Fraser did not see fit to participate in that process and collaborate in that process, and therefore this is what I'm left with. I only have one person's collaboration with the process. So this is how I said I was going to divide the property, so now I'm going to divide it that way. And it seems to me that Mrs. Fraser's objections to it are preserved because she didn't, under what court order could she walk in on the last day instead of before a hearing and say, well, I didn't prepare the list the judge sold me to, but now I have a list. Well, but the whole idea was to give the judge some sort of tool to be able to comply with the statute and make the appropriate findings. Right, but if somebody doesn't cooperate with the tool that the judge gave them to use, then it shouldn't be hard to complain that the process ended up with an unfair result. Isn't it, in effect, what the trial judge did, more of a sanction for her failure to comply? I don't think it's a sanction. I think it's that what happened here is that Mark Fisher, who represented Harvey Fraser, he was supposed to have her list in the middle of March. He never got her list. To expect on April 5th Harvey Fraser and his attorney to look over lists that were noncompliant with the order that Judge Johnson had entered and which were prepared after Carole Fraser had an opportunity to see what marital property Harvey Fraser selected pursuant to the court order and also pursuant to what happened at the house, which is also in the record and is subject to part of Mr. DiMarco's appeal, what it does is it rewards bad behavior. That's what it does. For Mrs. Fraser to be able to at the last minute produce a list and then says it's not fair that even though my list was noncompliant with the order and they didn't get it to the last second, the division of personal property isn't fair. What evidence does she have that it's not fair, by the way? She produced no evidence of value. She produced no evidence of what was not marital. So all the judge did was he said, this person complied with my order. This is the information I have, and I was supposed to have all the information three weeks ago. One party didn't give me any information, so I'm forceful on the information that the compliant party gave me. Did she say, though, at the time of the hearing she had a list, but it wasn't allowed, other than the list objecting to Harvey's? Did she have something? That's what she had. She had the list objecting to what Harvey or saying what she wanted that Harvey had chosen. That's the list she had, and it was brought to court the day that the judge had set to divide the property, rather than, I believe it was three weeks previously, so the parties could go look at each other's lists and maybe even resolve it. So I think that when you don't obey a court order and comply with the process, and when you present no evidence of value or what's marital or non-marital, you can't come to an appellate court and complain about the result. Thank you. Thank you, counsel. Now, Mr. Domenico, as you walk up, I will say that there was one of the cases I reviewed that had a low Monaco who was counsel. You are not in any way that person, correct? I have not, Your Honor. Okay. I'll start where Mr. Ostro left off with the personal property. I don't know how else you can describe how the judge handled this, but to sanction my client for not technically complying with your order. The record is clear. Well, what was the judge to do? On that day that had been set for hearing, this was their time. He did not have the appropriate information. What was the trial judge to do? I thought if the judge felt – I mean, how could he make the determination of marital and non-marital, but with the list he was given? He was – the list that was prepared by my side – By Harvey. No. I'm sorry. By the list that he was given by Harvey. What other – he could have considered the list that my side of the case prepared, which was a list that responded to and trimmed down whatever disputes there was going to be. But counsel on the other side had not seen that list. Right? That's correct. I mean, had not seen that list. You're set for hearing. That's correct. So, you mean to say that you're proposing the court would have taken the time right there in the courtroom? How would the attorney for Harvey had an opportunity to respond during the course of the hearing, never having seen the document? Well, first, I think that the way that my side of the case handled it, which was a list that responded to it, short-circuited the entire hearing or at least trimmed down what the issues are. Because the way that the judge wanted was, you make a list, you make a list. Then we'll have to spend two hours amalgamating it into one to figure out what's in dispute and what's not in dispute. Our way was to simply cut through that process and say, fine, we can see A, B, C, D, E, F, G, and we're only in dispute as to X and Y. To me, that's a much more efficient way to handle it. The only problem is, with all due respect, you weren't the judge. I mean, the judge set a procedure that needed to be followed. That's correct. And if the judge felt that that procedure was not followed, she could have sanctioned my claim. He could have held her in contempt. Mind you, now, Harvey Frazier's side of the case, there's no petition in the record that says, hey, you're in contempt of court, I don't have the list, I'm complaining, you didn't comply with the order. They didn't file any sort of petition for will to show cause or any sort of pleading that complained about this. They just went into court and said, well, I didn't get the list until now, and the judge said, well, that means you just get everything on your list. Now, Mr. Ostra says, well, why should we be able to complain because there's no evidence of value or characterization? Well, of course there's no evidence. That's the whole point. The way this judge handled it was to not have any sort of hearing or take any kind of evidence. Mr. Frazier's... Excuse me. The judge took evidence. The judge had a document, Harvey's document. That's the basis on which he made his decision. Correct? That is correct. But to say that the judge heard evidence of value and characterization, he certainly didn't ask my client anymore. My side of the case was not permitted to offer any testimony as to, hey, the china that Mr. Frazier put on his list was a family heirloom of my client's that was given to her by her grandmother. This judge just said, you didn't comply with my deadline, end of story, you get everything on your list, please get out of my courtroom. That's how he handled it. That's not dividing property in an equitable way, which is what 503 says. And I might add, the record shows that the deadline for this list that the judge set was March 15, 2013. Same day, March 15, 2013, the judge granted Mr. Carroll, who was my client's previous counsel, leave to file his motion to withdraw as my client's attorney. So how concerned was this judge really at the time about this March 15 date, that we were married to this date? He was letting Ms. Frazier's prior counsel out the same day that it was due. So how important was it? But the attorney doesn't make the list, counsel. We all know that. The client goes and makes the list to hand to the attorney. Well, I think that they do. I mean, you don't need an attorney to make a list of what personal property there is that somebody wants that's in their own home. I think that they do it in conjunction. But I would agree with you that it's substantially from the client. But, again, the record is clear. Not only was she in between her attorneys, her attorney was granted leave to withdraw, or I think was granted leave to file a motion to withdraw that day. So his exit from the case was already in motion as of that day. But she was complaining about heart palpitations. She had a medical condition at that time. That's what she told Judge Johnson on April the 5th that she was having, and there was a medical condition associated with it. So in between attorneys having a medical condition, I understand if it wasn't technical compliance with the order. But what would have been the harm in taking an extra two weeks to comply with the statute so we could have some evidence on value and characterization and give the other side a chance to review the list that we thought short-circuited and cut down the issues that were in dispute as far as the personal property. I guess there comes a point in time, and, again, this relates back to our first hearing and you weren't here, so you will know why maybe I'm asking this. There comes a point in time when an additional two weeks and an additional two weeks becomes an impossibility to get to the end of the case. This case had reserved only personal property. Now, I am assuming it wasn't just pots and pans based upon the other information we have here. But it's a list. It is not, and he didn't even ask for values on that list. The ones in controversy would have been, they would have had a testimony on that. But he just wanted, give me a list of what you want. Why couldn't that have been complied with? And why do we need an additional two weeks to do that? Well, my side of the case complied with it in the sense that we tried to cut through and lessen the dispute to what was really an issue. She was in between attorneys. She had medical conditions. I don't know what the harm would have been for an additional time if that's what their complaint was. If their complaint was that they needed a little bit more time to review what was given to them, what was the harm in coming back the next week? But even with the time that there was between the deadline that was missed and the hearing date, the list that was asked for wasn't produced. That's correct. It was given to them at the time of the hearing. But, again, nobody felt the list wasn't the same. That's correct. It was done in a way that was responsive to the list. Now, again, there was nothing filed by Harvey Fraser's side of the case that complained about this at all. And so there's a suggestion in the blue brief that we've somehow waived this because the lawyer at the time did not speak up or voice her objection. But we were not noticed that there was going to be an objection. No petition filed a holder in contempt. No petition complained about this. We just stepped up, and Mr. Fisher said, I just got the list. We didn't comply. And the judge said, that's the end of the story. And that, to me, is an equitable distribution of property. I don't see how that comports with the case law that lays out the evidentiary prerequisites. I don't think a list from one side without any input from the other on these facts complies with the statute. That's not equitable. And what was my client's grandmother's China even doing on Mr. Fraser's list in the first place? You might ask yourself that question. With respect to the other issues, very quickly, Mr. Ostro said that I have a positional case that we've cited that presents facts like these. Well, of course, every case, the facts are different. But, you know, this isn't a strict unconscionability case. This isn't a strict arrest case. This isn't a strict undue influence case. This has elements of all of them. And in the unconscionability context, you know, the Supreme Court talks about how an agreement can be substantively unconscionable, procedurally unconscionable, a little bit of both. Well, this is the kind of case where you've got a little bit of everything going on. You have a little bit of undue influence from the lawyer. You have stressors and arrests and the personal life of the litigant, all of the testimony which went on effectively unrebutted and corroborated by her friend, Danita McCarty, that testified at the hearing. You know, and you have unconscionably of terms. So all of those taken together, I don't know if there's actually a case. Most of these cases focus on one area or the other. I would suggest to you that this case presents facts that encompass all of them together. I'll stick by my point with respect to the 1203 motion. I do think it's form over substance. I think it's an interlocutory order that the Court has inherent authority. This Court ultimately wants to say that it was a final judgment, and it's final enough at least for 1203. I think Your Honor's point was well taken about proximity and time, because the fact of the matter is if you have to wait so long to, you know, until all reserved issues are resolved to bring a 1203 motion, I mean, that's simply not practical. You know, there's a case called Sussman from last year that I know I cited in my brief. I'm sure you've read it. You know, one of the issues there was the reservation of a tax liability. You know, my goodness, for the IRS to figure out what the tax liability is, there could be challenges that could take years and years and years to ever decide, you know, what that liability would be. So to say that you have to wait until the end of that time to bring a 1203 motion, if 1203 is even the absolute only vehicle you can use, I mean, that's just not a practical answer. The Court doesn't have any further questions? I thank you for your time. Thank you. Thank you. Counsel, thank you for your arguments, and thank you for the effort into your arguments. We will take this matter under advisement, and we will now adjourn. Thank you.